## FRANCIS BARING & others *vs.* EBENEZER CRAFTS.

**C.** was a joint owner with H. & Co. of the barque Roman, but not a partner in their general business: H. & Co. projected a voyage for the barque, in which they were to be interested in part, and P., as supercargo, in part; and C. afterwards agreed with H & Co. to be interested in one fourth of their part: H. & Co. obtained a letter of credit from B. & Co., of London, through W., their agent in Boston, authorizing P. to value on them, at port or ports in South America, for account of H. & Co. and P., for the cost of any shipments of merchandize made for their joint account, on board the barque Roman, for any sum not exceeding £20,000 sterling, if drawn within six months from date, and if accompanied by bills of lading and invoices of such shipments, consigned to the order of B. & Co.; and H. & Co., at the same time, in their names only, signed an agreement to provide, in London, sufficient funds to meet the payment of whatever might be negotiated by virtue of said letter: When this letter was procured, W. was informed by H. & Co. that C. was interested in the credit and in the voyage The barque proceeded on her voyage, under written instructions from H. & Co. to P., given with the knowledge of C., recommending that P. should give a decided prefer ence to a hide voyage from South America to Amsterdam, but giving him the entire control of the barque, to go with her, or send her, where he pleased : The barque ar rived in South America after the expiration of six months from the date of the letter of credit; and P., finding it difficult to procure hides, loaded the barque with coffee, and proceeded with her to Trieste, consigning the cargo to the order of B. & Co., to whom he forwarded an invoice and bill of lading : To pay for the coffee, P. drew two bills on B. & Co., on different days, one for £10,000, and the other for £7,000, and forwarded advices to H. & Co., who received them after they had suspended payment and assigned their property to C. for the use of their creditors : C. immediately made to H. & Co. a written disclaimer of all interest in the voyage of the barque, denying P.'s authority to purchase the coffee or draw the bills on B. & Co.: H. & Co. ratified P.'s doings, and wrote to B. & Co., urging them to protect the bills drawn by P., but did not give them notice of C.'s disclaimer : The bill for £10,000 was accepted by B. & Co. for the joint account of H. & Co. and P., and the bill for £7,000 was afterwards

accepted and paid by them, *supra protest,* for the honor of P., the drawer; and they drew on the consignee of the coffee at Trieste for the amount of those bills, and received that amount from him : The proceeds of the coffee fell $21,000 short of said bills, and the consignee redrew on B. & Co. for that sum : In the mean time P. failed, and his property was assigned, under the insolvent law of Massachusetts : B. & Co. presented a claim for said $21,000 against the insolvent estates of H. & Co. and P., and received dividends thereon : The name of C. did not appear in the books of B. & Co., nor in their correspondence with H. & Co., on the subject of the bills and the cargo of coffee : B. & Co. brought an action against C. to recover the residue of the $21,000.

*Held,* that C. was liable to third persons, as a partner of H. & Co. and P., for all contracts made, in the prosecution of the voyage of the barque, by H. & Co., as superin tendents of the voyage, and by P as supercargo, if made within the scope of their authority, although no name, firm, or special designation, was adopted, to distinguish such contracts from the general business done in the name of H. & Co.   *Held also,* that P., in drawing the bills on B. & Co., though they were not drawn on the faith of the letter of credit which had expired, acted within the scope of his authority to conduct the voyage and make all contracts incident to its promotion.   *Held also,* that C.'s disclaimer to H. & Co., after the purchase of the coffee and the drawing of the bills by P., had no effect on the rights of B. & Co., C. having no authority to revoke the authority of P., after it was executed.   *Held also,* that B. & Co., by keeping their books and stating their accounts in the names of H. & Co. only, had not exonerated C. from his liability to them, nor manifested an intention to waive their claim upon him. *Held also,* that C. was liable, as well for the money paid by B. & Co. on the £7,000 bill, as on the other bill, and that they were entitled to judgment against C. for the full amount of the claim made on him.

ASSUMPSIT for the balance of an account alleged to be due to the plaintiffs.

At the trial, before the chief justice, the plaintiffs' counsel opened the case as one of joint liability of the defendant with Elisha Hathaway, Augustus L. Richardson, Elisha Hathaway, jr., and Thomas Popkin, and stated that all except the defendant had been discharged under the insolvent laws of this Commonwealth; dividends having been paid from their estates, which were credited to the account, leaving the balance now claimed of the defendant.

The plaintiffs introduced depositions, from which it appeared that the abovenamed Hathaways and Richardson were partners, from the summer of 1834 to the autumn of 1837, under the firm of E. Hathaway & Co., and that their business was that of commission merchants and ship owners ; that the defendant, though not a member of the firm, was part owner of vessels with them, and was occasionally interested with them in voyages and adventures ; that Hathaway & Co. and

Baring & others *v.* Crafts.

the defendant, in 1836, were owners of the barque Roman; that Hathaway & Co. projected a voyage for her to South America, in which they were to be interested to the amount of two thirds, and Thomas Popkin, who was supercargo, was to be interested to the amount of one third; that the defendant became interested with Hathaway & Co. and Popkin to the amount of one fourth of Hathaway & Co's. two thirds; that the letter of instructions, which is copied in the margin,*

* Boston, March 9th 1836.   Thomas Popkin, Esq.   Dear Sir · According to our agreement, we have prepared the barque Roman for an expedition to South America, of which you are to have the entire management; and we now give a sketch of our ideas upon some parts of the same, as likewise a memorandum of the rates of freight, as agreed upon with you.

We wish you to stop at the Cape de Verd Islands, (the Isle of May is most preferable,) and procure a cargo of salt, for account of owners of the vessel. For the purpose of facilitating you in the purchase, we enclose a letter of introduction from Messrs. E. Train & Co., by means of which you will be able to pass bills on us for the cost.   .

With this salt it will be best to proceed to Buenos Ayres for a market, and there you will decide upon your plan of operations afterwards.   We recommend, however, giving a decided preference to the hide voyage from thence to Amsterdam, but place the vessel entirely under your control, as it is decided upon, that whatever cargo she takes, and wherever she may proceed, two thirds of the same are to be upon account of her owners, and one third for account of yourself, unless the rate of freight received should be equal to or more than is stipulated herein; and in the same proportion, taking all things into consideration, for any other voyages not now alluded to; observing, however, that the rate of freight for cargo home is fixed lower than any other, because that is considered to be only undertaken as a last resort; and it is also understood that, if she come to the United States, she is to be loaded to our address, and to come to Boston, unless great profit is expected to result to the ship from any variation therefrom.

We likewise hand you a letter of credit upon Baring, Brothers & Co., London, for twenty thousand pounds, which will be used for the purchase of the cargo.   Perhaps you may wish, as prospects at the River Plate may be bad, to proceed elsewhere for a cargo; and you will understand that we place the vessel under your entire control, to go with her, or send her where you please; having full confidence that you will keep our interest always in view.

The Roman has on board cordage, flour and bread, more than will be required for ship's use.   Please sell the surplus when and where you deem best for ship's account; but send us a landing certificate of all the cordage.

Rates of freight agreed upon for the Roman.   [Here were inserted the rates of freight for various articles, to various ports.]   Demurrage is to be fixed at $35 per day, after allowing a reasonable time at any port, of which two thirds

was given to Popkin, with the knowledge of the defendant: and that a letter of credit on the plaintiffs (referred to in said instructions) was obtained by Hathaway & Co., as follows: " Boston, March 7th 1836. Mr. Thomas Popkin, of Boston, is hereby authorized to value on Messrs. Baring, Brothers & Co., London, at sixty days' sight, at port or ports in South America, for account of Messrs. E. Hathaway & Co., Boston, and himself, for the cost of any shipments of merchandize made for their joint account, on board the barque Roman, for Europe or the United States, for any sums not exceeding, in all, twenty thousand pounds sterling, and the bills will be duly honored, when presented at the banking house of Messrs. Baring, Brothers & Co., in London, if drawn within six months from this date, and if accompanied by bills of lading and invoices of such shipments, consigned to the order of Messrs. Baring, Brothers & Co. If desirable, the bills for one half of the above credits may be drawn before forwarding the invoices and bills of lading. For Baring, Brothers & Co. T. W. Ward, Atty.: " That the following paper was attached to a copy of the foregoing letter of credit: " Boston, March 7th 1836. Received the original of the above letter of credit for £20,000 sterling. In consideration whereof, we hereby agree with Messrs. Baring, Brothers & Co., to provide, in London,

---

are to be borne by the ship, and one third by yourself. On the cost of the cargo you are to receive a commission of two and a half per cent., in addition to the usual commissions; and on the sale in Europe one per cent., in addition to the usual commission.

This voyage is entered upon with particular reference to a cargo of hides from South America to Amsterdam.

You are at liberty to interest us in any operations from South America to this country to our address, to the extent of one third, where you have no interest and to the same extent as yourself, where you have an interest; and likewise in jerked beef from thence to Havana, to the same extent as you interest yourself; the orders for insurance to come to us. And, to facilitate any operations, we hand you a credit upon ourselves.

The commissions in Europe to be earned by you, whether you go with the cargo or not.

Yours respectfully,

E. Hathaway & Co.

sufficient funds to meet the payment of whatever may be negotiated by virtue thereof, at the maturity of the bills, and also to give security here for the same, at any time previous thereto, if required by them or their agent. E. Hathaway & Co."

It was in evidence that the barque Roman sailed, soon after said instructions were given to Popkin, for her ports of destination, the Cape de Verd Islands and Montevideo, whence Popkin took her to Rio de Janeiro, where she arrived on the 13th of September 1836, after said letter of credit had expired; that he there purchased a cargo of coffee, and sailed therewith to Trieste; and that, to pay for the coffee, he drew two bills on the plaintiffs, for account of E. Hathaway & Co. and himself — one on the 13th of October 1836, for £10,000, and one on the 21st of said October, for £7,000 — which bills were the basis of the account in suit: That E. Hathaway & Co. stopped payment on the 7th of November 1836, and on that day made an assignment of their property to Crafts, the defendant, for the use of their creditors, under *St.* 1836, *c.* 238, by an indenture tripartite, executed by them, of the first part, said Crafts, of the second part, and said creditors, of the third part: That, on the 22d of said November, the plaintiffs, in London, accepted the said bill of £10,000, for the joint account of E. Hathaway & Co. and Popkin: That, on the 5th of December 1836, advices were received at Boston of the purchase of said coffee, and the drawing of said bills; and the defendant thereupon directed and delivered to E. Hathaway & Co. the following letter: "Gentlemen. Having learned from you that Mr. Thomas Popkin has concluded to load the barque Roman with coffee at Rio de Janeiro for Trieste, and as he has, in my opinion, no authority to justify him in undertaking any operation of the kind, for account of the owners of the Roman, under the instructions and credit given him by you, as ship's agent, at the time of his leaving Boston, I hereby relinquish to yourselves, or Mr. Popkin, or whomever it may concern, all my right, title and interest, to any share in the aforesaid cargo of coffee, and shall not consider

myself bound for any loss which may arise from said opera-
tion, and give up the use of my share of said vessel, from the
time of entering upon the operation, until she is discharged
and freed from the same at Trieste and ready for other busi-
ness; denying, fully and entirely, the authority of Mr. Pop-
kin, or any other person, to interest me in the same. Eben.
Crafts: " That this disclaimer was not made known to the
plaintiffs: That E. Hathaway & Co. ratified the aforesaid do-
ings of Popkin, and wrote to the plaintiffs, under date of De-
cember 5th, urging them to protect Popkin's bills: That
Popkin went to Trieste with the cargo of coffee, for the pur-
pose of advising and assisting in the sale thereof: That the
plaintiffs, on the 9th of January 1837, accepted the bill of
£7,000, *supra protest*, for the honor and on account of Pop-
kin, the drawer, and informed Hathaway & Co. of this fact,
by letter dated the 14th of said January: That the plaintiffs,
on the 15th of March 1837, paid said bill, according to their
acceptance, declaring (as the notary certified) that they, nev-
ertheless, held " the said drawer, and all others whom it might
concern, in and by said bill, responsible, always obliged to
them for reimbursement: " That the plaintiffs, in January
and April 1837, anticipated the proceeds of said coffee, by
drafts on the consignees at Trieste; and that, as the proceeds
ultimately fell short of those drafts, by about $21,000, the
consignees redrew, for this deficiency, on the plaintiffs, who
afterwards presented a claim for this amount against the in-
solvent estates of E. Hathaway & Co. and of Popkin, and
received dividends thereon: That Crafts, the defendant, as
assignee (as before mentioned) of E. Hathaway & Co., paid
to the plaintiffs' agent two dividends on their said claim, one
in June 1838, and one on the 20th of December 1838: That
the plaintiffs' said claim was presented to the defendant, as
said assignee, in March 1838, in the form of an account against
" the owners of the barque Roman."

It also appeared, that in the invoices and documents, in the
plaintiffs' books, in the statement of their accounts, and in

their correspondence, the names of Hathaway & Co. only were used.

T. W. Ward, the plaintiffs' agent, testified that when he gave the letter of credit, on the 7th of March 1836, it was stated to him by Richardson, who applied therefor, that the defendant was to be interested in the credit and in the voyage; and that, after advices were received from Popkin that he had drawn on the plaintiffs, E. Hathaway, sen. called on the witness several times, and very strongly urged him to have the bills accepted; that the witness called at the office of Hathaway & Co., where Hathaway, sen. and Richardson stated to him, "as a reason for the plaintiffs' safety in accepting the bills, that Mr. Crafts was responsible for them, and was interested in the cargo." The witness also testified that "they gave other reasons — such as Popkin's being also concerned. But this of Mr. Crafts' being concerned was one of them." This witness further testified, that he wrote to the plaintiffs, and stated the case of these bills, and that he thought the plaintiffs "would be safe if they did accept them, inasmuch as Popkin and Crafts were both interested and responsible, and also as Crafts was assignee of Hathaway & Co., and as Crafts was also concerned in another voyage." But E. Hathaway, jr. and A. L. Richardson testified, that they had no recollection of stating to Ward, or of having heard it stated to him, after they had knowledge of the purchase of the coffee and the drawing of the bills by Popkin, that the defendant was interested in the coffee, or liable to pay the bills. And the plaintiffs' counsel admitted that E. Hathaway, sen. would testify, if he were present, in the same manner. Said Richardson also testified, that he said to Popkin, at or just after the time of delivering the letter of instructions to him, "do not touch coffee, unless exceedingly low," or words to that effect.

Popkin testified that he did not engage in the hide voyage, on account of the difficulty of procuring hides, and the high price of them; that he considered hides as only one object of the voyage, and did what he thought best in respect to the

voyage; that the credit expired before the bills were drawn, by reason of the outward voyage being protracted; that one cause of the protraction of the voyage was, that he took a large number of shipwrecked passengers from Salt Island to Montevideo, for whom $6,000 passage money was received.

The parties also introduced the correspondence between them, the letters of advice from Popkin to the plaintiffs, the invoices, and various other documents. And it was agreed to take the case from the jury, and submit it to the decision of the court, upon the evidence; the court to draw such inferences as a jury would be warranted in drawing, and to order a nonsuit, or a default and judgment for the plaintiffs for what sum should be due from the defendant.

This case was argued in February 1844.

*C. P. Curtis & B. R. Curtis,* for the plaintiffs. When the letter of credit was granted, the defendant was concerned, jointly with Hathaway & Co. and Popkin, in the business for which that letter was obtained. In this business, the names of Hathaway & Co. embraced and designated the defendant. Ward, when he granted the letter, was informed of the fact that the defendant was interested, and must have relied on the defendant's liability. Parties are held by any name which they use. *Etheridge* v. *Binney,* 9 Pick. 272. *Ex parte Gellar,* 1 Rose, 297. *Trueman* v. *Loder,* 11 Adolph. & Ellis, 594. The letter of instructions was the basis of all the subsequent movements in the voyage. As the names of Hathaway & Co., in that letter, designated the defendant, so the same names, used in the invoices, &c., and in the plaintiffs' books, also designated him. This view is confirmed by the fact, that the plaintiffs were advised by Ward that they might safely accept the bills after the six months had elapsed, and that this advice was given to them because Hathaway & Co. had declared that the defendant was liable. And as the defendant had agreed to be interested in the voyage which stood in the name of Hathaway & Co., he is bound by what they said to Ward.

The coffee was so purchased as to make the defendant in-

terested therein as a partner. The letter of instructions to Popkin was such as requires to be liberally construed ; and as he acted *bonâ fide,* and within the supposed limits of his authority as agent, his principals are bound by his acts. Story on Agency, §§ 74, 75, 82. Besides ; Popkin was not a mere agent, with a naked authority, but was a partner ; and therefore was not, like such agent, bound to regard the strongly expressed wishes of Hathaway & Co. as positive orders. *Brown* v. *M'Gran,* 14 Pet. 494. But the conclusive consideration is, that the vessel was put under his entire control, with liberty to take some other cargo than of hides, if the " prospects " of a hide voyage should " be bad."

The defendant cannot avail himself of the fact, that the time expressed in the letter of credit had expired. Story on Agency, § 85. *Parkhill* v. *Imlay,* 15 Wend. 431. Popkin's general authority to go where he pleased would seem to authorize him to draw after six months. His letter of instructions did not restrict him to any particular mode of raising funds. See *Dusar* v. *Perit,* 4 Binn. 361. *Drummond* v. *Wood,* 2 Caines, 310. *Day* v. *Noble,* 2 Pick. 615. *Judson* v. *Sturges,* 5 Day, 556. Nor can the defendant's disclaimer to Hathaway & Co. avail him. He was a dormant partner, and could not withdraw without notice to those who knew him to be such partner. *Evans* v. *Drummond,* 4 Esp. R. 89. *Carter* v. *Whalley,* 1 Barn. & Adolph. 11. Gow on Part. (1st Amer. ed.) 261. Collyer on Part. 62. After a transaction is pending, such partner cannot withdraw, even with notice. The defendant, by paying dividends, as assignee of Hathaway & Co., on the account against " the owners of the barque Roman," of which he was one, acquiesced in the making up of the account in that manner, and acknowledged his own liability.

*C. G. Loring & Dehon,* for the defendant. There was not, originally, any contract between the defendant and the plaintiffs, concerning the voyage of the Roman, or the bills drawn by Popkin, or the letter of credit upon which the voyage was undertaken ; but the plaintiffs originally contracted with Hathaway & Co. and Popkin only. *French* v. *Price,* 24 Pick.

19.  *James* v. *Bixby*, 11 Mass. 34.  *Sylvester* v. *Smith*, 9 Mass. 119.  *Cox* v. *Reid*, 1 Car. & P. 602.  *Loyd* v. *Freshfield*, 2 Car. & P. 325.  *Bank of U. States* v. *Binney*, 5 Mason, 176. Story on Part. §§ 134, 140.  Though Ward was informed that the defendant was interested, yet he chose to issue the letter of credit to Hathaway & Co. and Popkin, and to take the stipulation of Hathaway & Co. to remit for payment of the bills that might be drawn.

If there were originally any such contract, so that the defendant would have been liable on account of bills drawn within the time of the credit, yet Popkin had no authority to draw after the expiration of the time ; and so the bills were unauthorized and not binding on the defendant, and were never assented to or adopted by him, but were, on the contrary, expressly disaffirmed and repudiated.  Story on Part. §§ 334, 406–408, 417, 418.  *Clement* v. *Dickey*, Paine, 377.

If Popkin had authority to draw the bills, and if the plaintiffs might have accepted them on account of the defendant as jointly liable with Popkin and Hathaway & Co., yet the bills were not accepted and paid on the joint account or credit of the defendant with them, but solely upon the account and credit of Hathaway & Co. and Popkin ; and the plaintiffs, having originally elected to look to them only, cannot now claim of the defendant.

The acceptance of the bill for £7000, *supra protest*, for the honor of Popkin, the drawer, confines the plaintiffs' remedy, on that bill, to him alone.

SHAW, C. J.  This case having been submitted to the court, upon the facts as well as the law, upon a mass of written and oral evidence, it is difficult distinctly to separate and state the points of law decided.

The question is, whether the defendant was jointly liable with E. Hathaway & Co. and Thomas Popkin, for the plaintiffs' balance of account ; all the other parties having been discharged under the insolvent laws.

It is admitted or proved, that E. Hathaway & Co. (Hathaway, Hathaway, jun. and Richardson) were general partners ·

33 *

that the defendant was part owner of vessels with them, not a partner in their general business, but occasionally interested, by particular agreement, in particular voyages and adventures; that he was part owner of the barque Roman; that a voyage was proposed by Hathaway & Co., for that barque, to South America; that Popkin was to be supercargo, and to be jointly interested one third in the voyage; and by agreement between Hathaway & Co. and the defendant, the latter was to be interested with them to the extent of one quarter of their two thirds.

This agreement to share profit and loss rendered the defendant liable to answer jointly, as a partner, so far as third persons were concerned, for all contracts and undertakings made in the prosecution of the voyage, although no name, firm, or special designation was adopted to distinguish such transaction from the general business done in the name of E. Hathaway & Co. This firm, having the general superintendence of the voyage here, and Popkin being supercargo, to conduct the business abroad, the defendant was bound by their respective acts as such agents, so far as they acted within the scope of their authority.

It appears further proved, and is an admitted fact, that at the outset of this voyage, it was to be conducted mainly by means of a letter of credit, for £20,000 sterling, obtained by Hathaway & Co. of the plaintiffs, through T. W. Ward, their agent in Boston. Such letter of credit authorized Popkin to draw bills to the amount specified, on condition of being so drawn within six months from date. Hathaway & Co. then gave an obligation to the plaintiffs, to provide funds for the payment of such bills. It is contended that the defendant is not liable for these bills, because, although he was known to be interested, he did not join in this contract of Hathaway & Co. Without stopping to consider whether this was within the scope of their authority to conduct the voyage and make all contracts incident to its prosecution, and whether the defendant would not have been bound by their act done as such agents; the answer is, we think, that the bills afterwards

drawn by Popkin were not drawn on this credit; that the term of credit had expired, and the plaintiffs were no longer bound by that undertaking, to accept his bills. The defendant's liability, then, if it existed, did not depend on the contract of Hathaway & Co., made in reference to that letter of credit. It depends upon the question, whether Popkin acted within the scope of his authority, as the agent of the joint concern, in drawing the bills in question. The defendant denies that Popkin was so authorized.

It appears by the letter of instructions given by Hathaway & Co. to Popkin, that they did not place any restraint or limitation on his authority, and that he did carry the credit of the owners with him. Thus, though they strongly recommended a hide voyage, and contemplated that as one of the objects of the adventure, they still left it to his judgment; and when Richardson cautioned him against coffee, it was with the qualification, *unless he should find,* &c., implying that it was advisory and not intended as a restriction of his authority.

Suppose then, as his right to draw on Baring, Brothers & Co. had expired, instead of doing so, he had found a house willing to sell him a cargo of coffee on the credit of the concern; would not the defendant have been bound as a partner by such contract? He was to share profit and loss; the contract was for him, and would enure to his use and benefit; and therefore, by the well known rule of law, we think he would have been liable as a partner. Whatever may be the agreement of the parties among themselves, the law makes such parties liable, as partners, to a third person who deals with them, and a joint action will lie. It is founded on the principle that they all share in the profit. And it seems immaterial what is the particular mode of taking the credit or making the contract.

And so it seems that the defendant's disclaimer, after he was informed that the cargo of coffee had been purchased, and the bills drawn, could not have any effect on the rights of third persons. The letter of instructions to Popkin

was an open letter, to be carried with him, as evidence of the authority given him by the owners. If that authority enabled him to bind the owners, and he acted upon it, they must stand bound, as to third persons, although the defendant had some understanding or agreement with his associates, that he was not to be bound, unless in a particular voyage or adventure. He could not restrain the authority of the super-cargo by such private agreement, nor could he revoke it after it was executed.

The remaining important question is, whether, in the mode of keeping their books or stating their accounts, the plaintiffs have waived their right of charging the defendant — supposing him liable — or have exonerated him by any subsequen' act.

When parties agree to transact business jointly, or under an agreement to share in the profits, the name or firm which they use is arbitrary and conventional. They may use the name of both, or of one of them alone, or any distinct designation by which all will be included and bound, as if their names were used. *Manufacturers & Mechanics Bank* v. *Winship*, 5 Pick. 11. *Etheridge* v. *Binney*, 9 Pick. 272. And when the joint dealing is confined to one transaction, and is conducted by one of the parties, by agreement or mutual understanding, a contract entered into in such name, and with reference to such interest and dealing, is binding as well on the party not named as on the party whose name is used. We think, therefore, that as Crafts, the defendant, by agreeing to take a joint interest with Hathaway & Co., and to share profit and loss with them, by operation of law became liable, jointly with them, to third persons, and as no other name or designation was adopted than that of E. Hathaway & Co., and that designation was used in the instructions, invoices and documents, the plaintiffs, in dealing with such joint concern, and using such name, waived no claim which the law gave them, against the defendant, on his joint liability, by not inserting his name in the accounts. So, if the name E. Hathaway & Co., as a name of firm, once bound the de-

fendant, because it in effect embraced his name and liability the same name must continue to bind him, till some notice of change. *Trueman* v. *Loder,* 11 Adolph. & Ellis, 589, and cases there cited. So the manner in which the plaintiffs stated the account in their books would not discharge their claim if it had once existed. *Barker* v. *Blake,* 11 Mass. 16. In that case, the particular account had been credited, and the account charged, to one of the partners ; but the court held that the creditor did not thereby discharge his claim against the partners. In the case at bar, the keeping of the books and accounts in the name of E. Hathaway & Co., under the circumstances stated, cannot be construed into an intent to exonerate the defendant, and look to the credit of Hathaway & Co. alone. And we can perceive no other evidence tending to show that, if the defendant was originally liable to them, they have done any thing manifesting an intention to waive such claim, or discharge such liability. If he was bound, it was a legal liability in consequence of his being jointly concerned in the voyage; not from the use of his name, nor because he had held himself out, or permitted himself to be held out, as one to whom credit was given. Keeping the account without inserting his name is no evidence, therefore, of an intent to renounce his liability. When the plaintiffs came to make out the account, with a view to assert their rights, they made it to the owners of the barque Roman, so as to charge the persons liable, whoever they might be.

It was insisted by the plaintiffs' counsel, that the defendant had assented to this statement of the account, in such a manner as to amount to an acquiescence on his part. The fact upon which this argument was raised is this : that the defendant was assignee, under a commission of insolvency, of some of the parties ; that the plaintiffs had presented to him their account, charging the owners of the barque Roman ; and that he, by receiving it without objection, and paying money upon it, had assented to it. We think there is little weight in the argument ; and we lay no stress upon this circumstance. The account was presented to the defendant as

assignee. The particular form of it probably did not attrac his attention; and his payments upon it were made from the funds of the insolvent house, who were chargeable at all events.

A question was made, whether any distinction could be taken between the bill for £10,000 and the bill for £7000, on the ground that the latter was accepted by the plaintiffs, *supra protest*, for the honor of Popkin, the drawer. Why this bill was so accepted does not distinctly appear. The main reliance of the plaintiffs, for their reimbursement, seems to have been upon the proceeds of the coffee, pledged for the payment of the bills; and as Popkin accompanied the property to Trieste, to advise and assist in the sale of it, possibly they might consider such acceptance as giving them a more distinct personal claim as against him, inducing him to attend with more zeal and care to their interests. But we do not perceive that this can make any difference. The defendant is not chargeable as a party to this bill, and would not have been so in any mode of accepting it by the plaintiffs. The bill was only the means by which the money was raised by a party authorized to act as the agent of the concern. Suppose Popkin had paid the bill himself; as, being a party, he was bound to do. So far as he was not reimbursed by the proceeds of the coffee, it would have been money paid for the use or the concern, for which they would be liable to him. Then if, under his authority, not only as agent and manager of the joint concern abroad, but being himself one of the joint adventurers, he engaged the plaintiffs to pay the money for them and receive the proceeds, and these proved insufficient, the plaintiffs became creditors for the balance to the parties jointly responsible.

But further; after Hathaway & Co. knew that the bills had not been drawn within the time limited, and of course that Baring, Brothers & Co. were not bound to accept and pay them according to the terms of their letter of credit, they wrote to the plaintiffs, requesting them to protect these bills. On the payment of the bill of £7000, which had been

accepted for the honor of Popkin, the drawer, they take care to say that they hold Popkin, *and all other persons, &c.,* liable to them for the amount. Now, even if they would not, on general grounds, have a right to charge to Hathaway & Co. the money paid on that bill, because accepted specially for the honor of the drawer ; still, after receiving that letter, they were justified in reinstating that charge in the account, as a good charge against the joint concern, and as so much money paid on their account. And whether Hathaway & Co. had received the disclaimer of Crafts, the defendant, or not ; or whether, as between him and them, he had a right to disclaim his liability, or revoke their authority to act for the concern ; it is obvious that he did not communicate notice of any such fact to the plaintiffs ; and as Hathaway & Co. had, by the original agreement, power to act for the concern, this request from them, to pay the bills generally, bound all the parties concerned, and placed them upon the same footing as if the bills had been drawn specifically on account of the owners of the barque Roman. We think, therefore, that no distinction can be made between the bill accepted for the honor of Popkin, the drawer, and the bill accepted generally.

*Judgment for the plaintiffs*